### THE OTTOMAN.

### THE WHITNEY.

#### METROPOLITAN S. S. CO. v. BRITISH & N. A. STEAM NAV. CO., Limited.

(Circuit Court of Appeals, First Circuit. April 16, 1896.)

#### No. 104.

1. COLLISION—SIGNALS—EVIDENCE OF INATTENTION.
   Where the evidence leaves no doubt that two blasts of a whistle were given by one steamer, which were heard on the other as only a single blast, the distance being such that both ought to have been heard, the court must conclude, in the absence of other explanation, that the officers and lookouts were inattentive.

2. SAME—STEAMSHIPS IN HARBOR.
   Where a steamship going out from Boston harbor, after crossing the channel to the northern side, and swinging round to a course about S. E. by E., was struck shortly after sunset by a steamer entering the harbor, which crossed the channel from the south side, *held*, that both were in fault,—the latter for inattention and lack of vigilance, as evidenced by not discovering the former sooner, and not accurately noticing her lights and position when discovered, by crossing the channel so as to involve danger of collision without seeing the risk incurred, and by mistaking a signal of two blasts for one blast, and making a wrong maneuver in consequence; the former for not immediately reversing and giving danger signals on receiving an answering signal of one blast, which indicated that her own signal was misunderstood or not assented to.
   Putnam, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Massachusetts.

This was a libel and cross libel in admiralty for collision. The libel was dismissed in the district court, and a decree rendered upon the cross libel, from which the original libelant appeals.

John Lowell and Robert D. Benedict (Eugene P. Carver and Wm. D. Sohier with them on brief), for appellant.

Lewis S. Dabney and Frederic Dodge (Benj. L. M. Tower with them on brief), for appellee.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

WEBB, District Judge. On the 28th day of September, 1892, at a little past 6 o'clock in the afternoon, a collision took place between the steamship H. M. Whitney, owned by the Metropolitan Steamship Company, and the steamship Ottoman, owned by the British & North Atlantic Steam Navigation Company, Limited, resulting in the sinking of the H. M. Whitney and injury to the Ottoman. The place of collision was in Boston harbor, at a point about 6,206 feet from India wharf, the pier of the H. M. Whitney, and about 4,180 feet from buoy No. 9. The H. M. Whitney, one of a line of steamers running between Boston and New York, was of 2,706 tons gross, 288 feet long, and drawing at the time about $11\frac{1}{2}$ feet forward and 15 feet aft. She was on a passage to New York, having left her dock at South Boston, about 9 minutes past 6 o'clock p m. The Ottoman was an inward-bound English steamer, of 4,843 tons gross, and about 420 feet in length, drawing about 20 feet forward and 21 feet 9 inches aft. She was going to her wharf at East Boston. The sun set at Boston that day at 5:46, and it was high tide at 3:37. The wind was light, and from the north, canting to the west, and the weather was fair. On the 1st day of October, 1892, the Metropolitan Steamship Company filed in the clerk's office a libel against the Ottoman, to recover the value of the H. M. Whitney; and, on the fourth day of the same month, the British & North Atlantic Steam Navigation Company, Limited, filed a libel against the Metropolitan Steamship Company, for the loss and damage of the Ottoman from the collision. On the 15th day of October, 1892, answers to both libels were filed. In district court these cases were heard together. On the 13th day of March, 1894, the decree of the district court, dismissing the libel of the Metropolitan Steamship Company, with costs, taxed at $1,174.59, was entered, and on the 16th day of March an appeal was claimed by the libelant in open court. Upon the libel of the British & North Atlantic Steam Navigation Company, Limited, an interlocutory decree in favor of the libelant was entered March 13, 1894; and, upon the acceptance and confirmation of the report of the assessors, a final decree in favor of the libelant for the sum of $9,775.13 damages, together with costs, taxed at $194.92, was entered June 23, 1894. On the same day an appeal was claimed in open court by the respondent, the Metropolitan Steamship Company. June 23, 1894, the district court ordered the two cases to be consolidated. The appeals were perfected by giving security, and were allowed.

The evidence is voluminous, and not without such conflict and contradictions as are usually found in controversies of this kind. The differences relate to the speed of the steamers, how they were steered, the paths they followed, how they were maneuvered, the lights they respectively exhibited, the signals by whistles that were given, and the precise spot of the collision. It is not denied that, upon both steamers, all regulation side and masthead lights were properly set, and burning clearly. There is no important difference as to the time of the affair, and such differences as there are may be easily account-

ed for by the fact that different clocks were referred to by the witnesses. To analyze and compare in detail all the evidence would extend the opinion of the court to great length, and does not seem necessary to a fair understanding of the reasons for the conclusions to which the court has been led by it. The Whitney left her dock, on the south side of the channel, at about 9 minutes past 6 by her clock, and by the same clock the collision was about 20 or 21 minutes past 6. As she lay in the dock at South Boston, she was heading about east across the channel; and at first ran 3 or 4 times her length across the channel, or from 864 to 1,152 feet towards the northerly side of the channel; and then ported her helm by two slight movements, under which porting she came round about 2½ points, putting her on a course about S. E. by E., or a little more easterly. It is evident that, as she swung under her port helm, she would continue to draw still further across the channel. From the time she left her dock, her starboard side and light were turned towards any vessel coming up the harbor, and continued to be so shown to any one further towards the south side of the channel than she was. From the evidence, we are satisfied that the Ottoman, till after the H. M. Whitney got fairly on her course of S. E. by E., was on the southerly side of the channel, and south of the H. M. Whitney. The collision was on the northerly side of the channel, from which there is no evidence that the Whitney ever departed. Indeed, the course of S. E. by E., with a little more easterly, carried her constantly more towards that side, so much so that it is argued on behalf of the Ottoman that on such a course she would have got aground, and therefore she could not have been sailing on such a course. To come into collision on the northerly side, the Ottoman must have crossed from the southerly side, where we find her when the H. M. Whitney left her dock. So crossing a narrow channel, she was bound to be vigilant. This crossing began in the neighborhood of buoy 9; for, although the chart course from that buoy is N. W. ¾ N., the pilot says that, just as they were abreast of buoy 9, they changed from the course of N. W. by N., on which they had been running to N. W. by N. ¼ N., or, as he expressed it, "about a quarter of a point to the northward," and this notwithstanding the fact that, at a short distance from buoy 9, a turn in the channel gave a chart course of N. W. by W. She held this course till a very short time before the collision, when, becoming aware of the proximity of the approaching H. M. Whitney, she ported, which, of course, sent her more to the north side. But as this last porting was just before the collision, and was made in the emergency of an impending danger, if up to that time the Ottoman was without fault, a mistaken movement should not prejudice her. The H. M. Whitney, from the moment of starting from her dock, inclined to the northerly side of the channel. There is no evidence which satisfies the court that she ever turned towards the southerly side, or approached it.

From the H. M. Whitney, at the time she left her dock to the moment of collision, the Ottoman was seen and watched. At first both the Ottoman side lights were seen, indicating that the Whitney was running across the bow of the Ottoman, and afterwards, till just before the ships came together, only the green light of the English

steamer was visible to the Whitney. This must have been the fact with the relative positions and courses of the two ships, as we have found them to have been. It must also have been the fact that the green light of the Whitney was shown to the Ottoman; and, notwithstanding the conflicting statements of the witnesses in behalf of the Ottoman, it is so found. The two steamers were steadily getting nearer to each other, and, when the Whitney came out, they were about two miles apart, a distance at which the side lights were visible under the requirements of the statute, and less than one-half the distance at which the masthead lights should have been seen. Yet the presence of the Whitney was not observed on board the Ottoman till the steamers were only about one mile apart. It is uncertain from the evidence whether the Whitney was seen before she had given a signal by whistle, but both were at very near the same instant. The Whitney's officers and lookout having steadily seen and watched the Ottoman, it was considered by her pilot that they were too far on each other's starboard hand for them safely to attempt to pass port to port. It was the privilege and the duty of the Whitney, by two whistles, to indicate her intention to direct her course so as to pass starboard to starboard, and she did so indicate. This right and duty was hers, her pilot having first determined to pursue this course, and the vessels not meeting head and head: and, upon two blasts of the whistle being so given, the duty of the Ottoman was to reply promptly by two similar blasts, and the steamers should then have passed starboard to starboard. There has been great contest over the question of what whistle signals were given by the Whitney. On her behalf, we have testimony from several witnesses on board of her that her first signal was two short blasts of the whistle; that the Ottoman replied with a single blast; and that the double blast was repeated, and again was replied to with a single blast of the Ottoman's whistle. The witnesses from on board the Ottoman, the only witnesses produced in her behalf on this point, differ only in respect to the first whistle from the Whitney, which they say was only a single blast. If there were no outside and independent witnesses on this question, we should regard the testimony of the witnesses for the Whitney of most weight in regard to what was done on board her. Her captain says he himself blew the whistles, and that the first signal was two short blasts. He is corroborated as to the fact that he gave the signal, and as to its nature, by the mate, the quartermaster, and a passenger. The evidence of the witnesses on board the Ottoman is that they heard only one blast, when the whistle was first blown. In all other respects they agree that the exchange of whistles was exactly as the Whitney's witnesses testified. But upon this point there is a great mass of evidence fully supporting the Whitney's witnesses. Witnesses all around, on shore and afloat, testify that the first signal from the Whitney was by a double blast of the whistle, and that that signal was repeated, after the Ottoman had replied by a single blast. These witnesses almost surrounded the Ottoman's position at the time. We can entertain no doubt that the whistles were sounded as is claimed for the Whitney. Those on board the Ottoman insist that they heard first a single blast only. We are not dis-

posed to attack their truthfulness; but, being persuaded that the first signal was a double blast, we are put upon the inquiry why only a single blast was heard. We cannot explain the difficulty upon any theory of the uncertain and irregular transmission of sound. These witnesses, without any material change of position or situation, accurately heard all the other signals. They even, according to their own statement, heard some of the first signal; whether the first or the last blast cannot be known. But the interval between the blasts of a double-blast whistle is very brief; merely enough to articulate and separate the sounds. They are not far enough apart in time to allow a change from a place where they are audible to one where they are inaudible. Moreover, no attentive witness has been produced who heard the first signal as a single blast of the whistle. The only explanation is that there was a lack of attention and vigilance on the part of the Ottoman. The result is that we hold the Ottoman was at fault for lack of proper vigilance; shown by not discovering the Whitney sooner, by not accurately noticing the Whitney's lights and position when she was discovered, by crossing from the south to the north side, so as to involve danger of collision, without seeing what risk was incurred, by mistaking the signal whistles of the Whitney, and by her consequent wrong maneuver.

As to speed, we are of opinion that the speed or forward movement of the Ottoman at the moment of collision was the greater. It is not necessary to attempt to determine the actual speed of either vessel at that instant. We have no doubt that, before the steamers actually struck, every effort was being made by each to escape danger by working their engines astern.

But the Whitney is clearly chargeable with serious faults, contributing to the fatal event. When it was determined by her master or pilot to pass starboard to starboard, and that determination was expressed by a double blast of the whistle, and she received a single whistle in reply, she still kept on, and repeated her signal, and only then took measures to avert collision. The Ottoman's reply of a single blast indicated either that the signal had been misunderstood, or that, for some reason, it would not be complied with. It was then her duty to stop and reverse, and to give danger signals. Keeping on, precious time was lost, enough perhaps to have enabled the ships to go clear; and certainly the opportunity to warn the Ottoman of her mistake went unimproved. The captain says he did not at the moment think of the rule requiring such action by him, and he is not sure that he knew it.

In conclusion, this court holds that both vessels were in fault, and that the damages and the costs of the district court should be divided. The decrees of the district court reversed, with costs of the circuit court of appeals for the appellant. Cases remanded to the district court, for further proceedings according to this opinion.

PUTNAM, Circuit Judge, being of the opinion that the Whitney does not maintain the burden of proving the Ottoman in fault by a preponderance of all the elements of the case, does not concur in the conclusions of the court.